## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DOROTHA LOUISE HAWKINS,            )
an individual                     )
                                  )
        Plaintiff,          )
                                  )
v.                                )     **Case No. 11-CV-372-JED-TLW**
                                  )
TULSA COUNTY COURT CLERK,         )
SALLY HOWE SMITH,                 )
in Her Official Capacity,         )
TULSA COUNTY, and the             )
BOARD OF COUNTY                   )
COMMISSIONERS FOR TULSA           )
COUNTY                            )
                                  )
        Defendants.         )

## OPINION AND ORDER

This is a disability-based employment discrimination case brought by Dorotha Louise Hawkins ("Hawkins" or "plaintiff") against Tulsa County Court Clerk Sally Howe Smith ("Smith"), the Board of County Commissioners for Tulsa County ("BOCC"), and "Tulsa County." Hawkins alleges that she became disabled following a stroke and that the defendants failed to accommodate her limitations. Hawkins also complains that she was subjected to a hostile work environment and retaliated against when she complained about the harassing behavior of her supervisor. The defendants seek summary judgment as to all of plaintiff's claims.

### BACKGROUND

Hawkins began her employment in the Tulsa County Court Clerk's Office (the "Court Clerk's Office") in September of 2000 as a clerk in the Criminal Courts Division. She transferred to the Accounting Department in 2004, assuming the position of Bookkeeper I.

Hawkins remained in that position throughout the course of the events allegedly giving rise to her claims in this case.

Hawkins has had numerous health problems. When she was hired by the Court Clerk's Office, she disclosed that she had congenital heart defects, aortic stenosis, hypertension, and back-related problems. Due to arthritis in her knees and back, she walked with a cane (and later a walker) for the entirety of her employment with the Court Clerk's Office. Hawkins's health problems caused her to miss a significant amount of work over her tenure. From January 2004 to April 2009, Hawkins was hospitalized six times for various maladies and was consequently absent from work. With respect to these hospitalizations, Hawkins was never denied a leave of absence for these illnesses and the Court Clerk's Office complied with any work place restrictions that were placed upon her.

On July 2, 2009, Hawkins had a stroke. She was absent from work less than three weeks, returning on July 21, 2009. She returned with a note from her physical therapist that said she "was not exhibiting any dizziness with her activities of daily living" and that she "was able to ambulate on level/un level surfaces and up and down stairs/ramps without difficulty." (Doc. 81-12). The note further stated that she should be able to work half days without difficulty. Hawkins also provided the Court Clerk's Office with a note from her physician that stated she "may return to work part time for a week then she may continue her regular schedule." (Doc. 81-13). The Court Clerk's Office abided this solitary restriction. Hawkins acknowledges that she did not provide the Court Clerk's Office with any further medical documentation indicating a need for additional workplace restrictions after July 21, 2009.

Hawkins's supervisor throughout the relevant timeframe was Theresa Wehmeyer. Wehmeyer also supervised Hawkins's counterpart, Sally Doris, who, like Hawkins, occupied the

position of Bookkeeper I. Prior to her stroke, Wehmeyer maintained a very positive relationship with Hawkins and Doris. Wehmeyer, who also walked with a cane as a result of knee problems, was described by Hawkins as the best supervisor she had ever had—at least prior to Hawkins's stroke. Wehmeyer purchased birthday and holiday cards for Hawkins, provided her with Thanksgiving and Christmas turkeys, and even gave her Christmas presents. Hawkins testified that Wehmeyer also paid for her to get a manicure, contributed to charity on her behalf so she could wear jeans at work, and gave her rides to work on two occasions.

The record demonstrates that Wehmeyer continued to provide such courtesies even after Hawkins's stroke. For example, Wehmeyer purchased presents for Hawkins for Halloween and Christmas of 2009, Valentine's Day and her birthday in 2010, and turkeys for Thanksgiving and Christmas of 2009. Around Christmas in 2009, Wehmeyer drove Hawkins to a Home Depot store to purchase gravel for a hole in her driveway and, when the store would not accept Hawkins's personal check, Wehmeyer paid for gravel out of her own pocket.[1] Additionally, on September 15, 2009, Wehmeyer evaluated Hawkins's work performance for the July 2008-July 2009 time period, awarding her the highest score Hawkins had ever received during her ten year employment with the Court Clerk's Office.

Hawkins maintains that, despite these seemingly kind gestures, Wehmeyer became mean-spirited to her at work after the stroke. Hawkins asserts that, within two weeks of her return to work after her stroke, Wehmeyer began harassing her on an ongoing basis. Hawkins's journal recounts how Wehmeyer "seemed to resent the fact that so many people from other departments were dropping in to see how [Hawkins] was." (Doc. 89-10). Her journal further discusses what she believed to be the change in Wehmeyer:

---

[1] Hawkins testified that she paid Wehmeyer back the following day.

> I'm having to use a walker because my balance isn't good yet, but [Wehmeyer's] insisting that I go around each morning to pick up the reports and that I take the checks to the Treasurers when they're written. It's extremely hard to carry things like that when using the walker. Sally did it a few times, the 1st week I was back, but then Theresa said I had to do it. I don't understand why she's being so cold about this. When she's had an operation, Sally [and] I have done all we can to make things easier for her.

(*Id*.). Hawkins testified that, even though her quality of work was no different than before her stroke, Wehmeyer would frequently criticize her for making mistakes. Hawkins testified that Wehmeyer would attribute the mistakes to Hawkins's stroke-related physical condition, accusing her of memory problems.[2]

On March 3, 2010, an incident occurred where Wehmeyer told Doris that she should divorce her husband, then criticized Hawkins's hair as looking like a mess. Wehmeyer then proceeded to question Hawkins as to whether she was taking too much pain medication in light of the fact that Hawkins's son had died of a pain medication overdose.[3] Hawkins was so upset that she went to the restroom to cry. A co-worker saw her shortly after and inquired what was wrong. When told of the incident, the co-worker then informed Vicky Goodson, an upper-level supervisor. The next day, Goodson contacted Hawkins and inquired about the incident. Goodson had Hawkins inform Smith of the details. Hawkins expressed concern at that time that she was afraid of retribution from Wehmeyer as a result of the incident being reported. Smith had a "strong talk" with Wehmeyer about her conduct, and on March 8, Hawkins and Doris were summoned to Smith's office where she, Goodson, and Wehmeyer were waiting. In the meeting,

---

[2] Hawkins acknowledges having short-term memory problems, but asserts that her long-term memory was not affected by her stroke.

[3] Hawkins responded that her son had died as a result of adverse reaction rather than an overdose.

Wehmeyer apologized to Hawkins and Doris and they accepted her policy. From Smith's perspective, it appeared as though it resolved the issue. Hawkins disagrees.

Hawkins says that, in the weeks that followed the meeting with Smith, Wehmeyer's negative conduct intensified. Hawkins recounts that Wehmeyer still forced her to walk to deliver checks when she did not feel physically capable of doing so. In addition, Hawkins received an email from Wehmeyer intended for a different recipient, which was critical of Hawkins for having a new phone despite alleged money problems. Hawkins received verbal warnings for carelessness on March 3 and 8 of 2010 and May 11 and 24 of 2010. On June 18, 2010, Hawkins was issued a written warning in the form of an Unacceptable Performance Notice. The written warning resulted from three alleged mistakes in failing to follow written procedures. Hawkins signed the warning, adding that she would "accept full responsibility for not taking extra time to prevent the errors." (Doc. 81-19). With respect to the written warning, Hawkins states that it was actually Doris who made the mistakes, but she accepted responsibility in order to protect Doris.

On June 9, 2010, Hawkins and Smith had an email exchange. Smith wrote to Hawkins, stating that she had a problem with Hawkins "shopping" for another position. (Doc. 89-13 at 2). Smith further stated that she was "obviously reviewing [Hawkins's] issues and again I currently have no position open that would accommodate your physical condition." (*Id.*). In her response, Hawkins stated in pertinent part:

> As I told you yesterday, Theresa has gotten a lot worse since I was called in to your office about the time she stepped over the line with comments about my deceased son and her perceived impression of any faults caused by my stroke. I asked you not to say anything to her and just let us handle it by letting it die down quietly back here, because I knew she would set out to hurt me in other ways, which she has done. Of course the notes she has written now would be biased and not entirely true, in order to inflict the harm that she wants. I don't even care

about that as long as she stops setting such a hostile, debasing environment back here.

*    *    *

…Things appear to be better today and, hopefully, it will continue that way.

Thank you for listening and for your help.

(*Id*.). The record does not reflect any further complaints on the part of Hawkins regarding Wehmeyer's treatment of her.

On June 28, 2010, Hawkins had a heart attack. This heart attack resulted in Hawkins becoming permanently disabled, exhausting her Family and Medical Leave Act time, and being terminated from her position with the Court Clerk's Office. Hawkins now receives Social Security Disability benefits and has made no attempt to return to work.

On May 23, 2011, Hawkins filed this lawsuit in Tulsa County District Court, and on June 14, 2011, defendants removed the case to this Court. Hawkins's Second Amended Complaint (Doc. 52) alleges claims against defendants for failure to accommodate, hostile work environment, and retaliation pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the Rehabilitation Act, 29 U.S.C. § 794, and the Oklahoma anti-discrimination statute, Okla. Stat. tit. 25, § 1301.[4] Defendants now seek summary judgment as to these claims.

<strong>STANDARDS</strong>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[4] Hawkins's Second Amended Complaint also alleged that she was wrongly terminated in violation of the ADA, Rehabilitation Act, and state law. In her response to the motion for summary judgment, Hawkins states that she "drops any claim for wrongful termination." (Doc. 89 at 2). Hawkins's claim for wrongful termination is therefore dismissed.

56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "By its very terms, [the Rule 56] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255.

The Supreme Court recently reiterated that it is reversible error for a court to weigh the evidence or resolve any disputed issues in favor of the moving party. *See Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam). A district court may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Id.* Thus, reaching factual inferences that conflict with the non-movant's evidence is contrary to the "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1868. The reason for this long-standing principle is that "witnesses on both sides come to [the] case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.*

As noted, defendant Smith seeks summary judgment as to all claims against her (*see* Doc. 81). Defendant BOCC's motion for summary judgment (Doc. 86) adopts and incorporates the arguments made in defendant Smith's motion and also seeks judgment as a matter of law on the basis that it was not Hawkins's employer.[5] For reasons stated below, the Court finds defendant Smith's arguments to be dispositive of Hawkins's claims in their entirety.

## I. Failure to Accommodate Claim under the ADA and Rehabilitation Act[6]

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). ADA discrimination cases are generally subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). The plaintiff bears the initial burden of establishing a prima facie case of discrimination under the ADA. To make a prima facie showing on her failure to accommodate claim, Hawkins must show that (1) she was disabled within the meaning of the ADA; (2) she could perform, either with or without reasonable accommodation, the essential functions of the desired job; and the defendants did not

---

[5] Hereafter, the Court will refer to arguments as being made by defendant Smith, but the Court's decision applies with equal force to defendant BOCC. The Court also notes that the case style of the Second Amended Complaint refers to "Tulsa County" as a defendant. As defendant BOCC points out, Hawkins's suit against Smith in her official capacity is treated as one against the County. The County, however, cannot be sued twice for the same offense. The Court will therefore ignore plaintiff's reference to "Tulsa County" in the case style, just as plaintiff has done in her response to Smith's motion for summary judgment (Doc. 89).

[6] The standards for analyzing a failure to accommodate claim are the same regardless of whether it is brought under the ADA or the Rehabilitation Act. *See, e.g., Cunningham v. Univ. of New Mexico Bd. of Regents*, 531 F. App'x 909, 919 (10th Cir. 2013).

"take reasonable steps to reassign her to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate future." *Bartee v. Michelin N. Am., Inc*., 374 F.3d 906, 912 n.4 (10th Cir. 2004) (quoting *Albert v. Smith's Food & Drug Centers, Inc*., 356 F.3d 1242, 1252 (10th Cir. 2004)).

Smith asserts that Hawkins's failure to accommodate claim fails to meet these essential elements. Specifically, Smith argues that Hawkins was not disabled under the ADA and Rehabilitation Act; Hawkins did not actually require an accommodation because she could perform the essential functions of her job; Hawkins never requested an accommodation; and even if she did, or it was obvious that she needed an accommodation, there was no reasonable accommodation that the Court Clerk's Office could provide her.

To qualify as disabled, plaintiff must show that he has "(A) a physical or mental impairment that substantially limits one or more major life activities," "(B) a record of such an impairment," or "(C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Here, plaintiff alleges that her ability to walk was impaired by her stroke. Walking has been regarded as a major life activity under the ADA standards. *Bragdon v. Abbott*, 524 U.S. 624, 659 (1998). Hawkins testified that she had trouble walking after her stroke. And while she had always used a cane to walk while working at the Court Clerk's Office, she required the use of a walker following her stroke. The record demonstrates that Hawkins's limitations in delivering checks to the various departments in the office were attributable at least in part to her shoulder injury which required her to use a sling while using her walker. In light of this evidence, Hawkins has sufficiently raised a dispute of fact as to whether she was disabled. As will be discussed hereafter, her claim still fails as a matter of law because Hawkins's request for accommodation was unreasonable.

The defendants argue that they were under no duty to accommodate Hawkins because the record demonstrates that she did not actually need accommodating to perform her job. "Generally, where an employee is able to perform the essential functions of the job to which she is assigned, the duty to accommodate does not arise, even if initiated by the employee." *Campbell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276, 1290 (N.D. Okla. 2003). The only limitation relied upon by Hawkins with respect to her accommodation claim is her difficulty in walking to deliver checks. This limitation, however, appears to have only been a serious problem while her shoulder was in a sling. Smith recognized this limitation in her June 4, 2010 email to Goodson, which stated that Hawkins was "having trouble running errands, carrying checks etc. bothering arm (obviously a problem yesterday, I saw her as well.)". (Doc. 89-6). On June 10, 2010, Smith emailed Hawkins, asking her if she was making deliveries. Hawkins responded as follows:

> Yes. I have no problems in that area and my arm is getting better every day. In fact, I think I'll try going without the sling tomorrow. I'll bring it in case it starts hurting, but I think I can remember not to reach sideways too far and I never have to reach above my head, so I think it'll be okay.

(Doc. 81-15).

Hence, by her own admission, it would appear that Hawkins did not need an accommodation to make her deliveries. This, however, is not necessarily dispositive of her accommodation claim and is instead treated as part of the calculus with respect to whether her request for accommodation was reasonable (assuming such a request occurred). *See Rauen v. U.S. Tobacco Mfg. Ltd. P'ship,* 319 F.3d 891, 897 (7th Cir.2003) ("Tipping the scales even further against the reasonableness of [plaintiff's] home office accommodation request is the fact that [plaintiff] can perform all essential elements of her job without any accommodation."); *Obnamia v. Shinseki*, 2:12-CV-58, 2013 WL 5408267 (S.D. Ohio Sept. 25, 2013) *aff'd*, 13-4228,

2014 WL 2781849 (6th Cir. June 19, 2014) ("Other Courts have held that a plaintiff's ability to perform the essential functions of her job without accommodation, although not dispositive of her claim, renders it more difficult to establish the reasonableness of the request.").

Hawkins asserts that she asked for an accommodation and that it was obvious that she needed one. Viewing the facts in the light most favorable to Hawkins, the Court agrees. It is apparent from the email exchange between Hawkins and Smith that Smith was aware that Hawkins was seeking a transfer. Indeed, the subject line of the initial email from Smith to Hawkins sent on June 9, 2010, reads "Your request for transfer." (Doc. 89-13 at 2). In light of this exchange, a reasonable jury could certainly find that Hawkins requested some form of accommodation.

Defendants assert that, even assuming an accommodation was requested, it was not a reasonable request for accommodation that the Court Clerk's Office was required to provide. As the ADA points out, a request for accommodation carries with it a requirement that it be "reasonable." 42 U.S.C. § 12112(b)(5)(A); *see also Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004). Reasonable accommodations are those which constitute "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position" or "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 987 (10th Cir. 2012) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)-(iii)). "It is axiomatic, however, that an employer is not required to relieve an employee of an essential job function." *Id.* (citing *Mason*, 357 F.3d at

1122). Nor is an employer required to "reallocate job duties in order to change the essential function of a job." *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995). Any accommodation that would cause other employees to worker harder or longer hours is not required. *Id.* (citing 29 C.F.R. § 1630.2(p)(2)(v)).

Here, Hawkins proposes two possible accommodations that the Court Clerk's Office should have permitted: transfer to a different department or the reallocation of her check delivery duties to Doris. Neither proposed accommodation is reasonable under relevant case law given the circumstances here presented. Hawkins has not disputed that the delivery of checks is an essential function of her Bookkeeper I position. Reallocation of this duty to Doris was not required by the Court Clerk's Office to accommodate Hawkins. Additionally, a factor to be considered by the Court is that Hawkins represented to Smith that she could perform this function, despite her disability, without accommodation. *See Rauen,* 319 F.3d at 897. As to her putative transfer, the record is devoid of any evidence which would demonstrate that there was any vacant position to which she could have transferred. Indeed, Smith's June 9, 2010 email states that there was "no position open that would accommodate your physical condition." (Doc. 89-13 at 3).[7] "[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation." *Duvall v. Georgia-Pac. Consumer Products, L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010) (citing *Taylor v. Pepsi–Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999)). Hawkins has not met that burden. As such, the Court finds that, as a matter of law, her request for

---

[7] Hawkins made reference in her deposition to a person who was purportedly willing to trade positions with her. However, that individual's position was occupied and thus, by definition, not vacant for purposes of a potential accommodation. Hawkins acknowledged as much. (Doc. 81-2 at 132 ("Q. Okay. But I guess, by definition, that would mean that the positions were not open; correct? A. Correct.")).

accommodation was unreasonable.  Defendants are therefore entitled to summary judgment as to Hawkins's failure to accommodate claim under the ADA and Rehabilitation Act.

**II.     Hostile Work Environment Claim under the ADA**

Hawkins's Second Amended Complaint alleges a claim for hostile work environment under the ADA.  Smith argues that she is entitled to summary judgment on the basis that the conduct relied upon by Hawkins was not severe and pervasive enough to constitute a hostile work environment, and even if it was, she is not liable as a matter of law because Hawkins unreasonably failed to pursue corrective measures.

Hostile work environment claims brought under the ADA are analyzed using the standards applied to similar claims brought under Title VII.  *Campbell v. Wal-Mart Stores, Inc*., 272 F. Supp. 2d 1276, 1292 (N.D. Okla. 2003).   "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII [and correspondingly the ADA] is violated." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

In *MacKenzie v. City & Cnty. of Denver*, the Tenth Circuit stated the standard for evaluating hostile work environment claims:

> To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.

414 F.3d 1266, 1280 (10th Cir. 2005) (citing *Harris*, 510 U.S. at 23). The employee's environment must be both subjectively and objectively abusive. *Id.* The Supreme Court has instructed lower courts to act as a gatekeeper in filtering out complaints which merely reflect the "ordinary tribulations of the workplace" to ensure that statutes like the ADA do not become "trivialized as a civility code." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

In her testimony and the journal she kept during her employment at the Court Clerk's Office, Hawkins details the treatment she received at the hands of Wehmeyer. Hawkins states that Wehmeyer's harassment began within two weeks of her return to work following her stroke and that it occurred on almost a daily basis such that she dreaded going to work each day. The specific examples of mistreatment identified by Hawkins are as follows: 1) Wehmeyer told Hawkins that her hair looked bad and accused her of abusing prescription drugs because her son had allegedly died as a result of an overdose; 2) Wehmeyer sent an email to Hawkins intended for a different recipient in which she criticized Hawkins for having a new cell phone despite alleged money problems; and 3) Wehmeyer would tell Hawkins that she was making mistakes or not remembering things because of her stroke. Beyond these three specific examples, Hawkins offers only generalized statements that she was mistreated on a regular basis by Wehmeyer.

Applying the factors referred to in *MacKenzie*, the Court does not see Hawkins's allegations to be sufficiently severe or pervasive enough to warrant presentation of this claim to a jury.[8] As an initial matter, Hawkins's statements regarding the frequency of mistreatment are

---

[8] The Court notes that its task in determining whether Wehmeyer's conduct was "sufficiently" severe, *see Harris*, 510 U.S. at 21, ventures near to placing the Court in the precarious position of weighing the parties' evidence—a function the Court is generally not to assume at the summary judgment stage. *See* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and*

essentially undisputed. While Smith has submitted the affidavit of Doris, which states that she does not think Wehmeyer ever created a hostile work environment for Hawkins or discriminated against her because of her disability, this at most creates a dispute of fact as to severity of the conduct. None of Wehmeyer's alleged conduct is physically threatening, but a portion of it (Wehmeyer's statement regarding Hawkins's deceased son) appears to be humiliating and severe when viewed in the light most favorable to Hawkins. Finally, the record does not reflect whether Hawkins's work performance was interfered with in any meaningful way, though it can be inferred, given that her home life appears to have been detrimentally affected, as she alleges that she frequently cried in the evenings after work.

It is, however, far from clear that the majority of the alleged mistreatment was related in any sense to Hawkins's disability. For example, the email inadvertently sent to Hawkins regarding her new cell phone appears completely unrelated to any perceived disability. Nevertheless, Hawkins appears to believe that the mistreatment was a direct result of her disability. To that end, she does at least allege that Wehmeyer made comments specifically relating to Hawkins's work performance being affected by her stroke. Likewise, Hawkins's email to Smith regarding Wehmeyer's mistreatment does reference Wehmeyer's "perceived impression of any faults caused by [Hawkins's] stroke." (Doc. 89-13 at 2). The Court will therefore assume, *arguendo*, that Hawkins has raised a dispute of fact as to whether Wehmeyer created a hostile work environment because of Hawkins's stroke. *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957-58 (10th Cir. 2012) ("[T]he severity and pervasiveness

---

*Jury Trial Commitments?*, 78 N.Y.U. L. Rev. 982, 1134 (2003) ("[if] judges are not to weigh facts in deciding summary judgment motions, how are they to find 'sufficient' evidence before denying the motion…").

evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact.").  However, as discussed below, the defendants are entitled to a defense based upon Hawkins's failure to take advantage of preventative and corrective opportunities to avoid the harm alleged.

In *Burlington Industries, Inc. v. Ellerth* and *Faragher v. City of Boca Raton*, both decided during the 1998 term, the Supreme Court fashioned a liability scheme for hostile work environment cases whereby employers can be held vicariously liable for a supervisor's harassment if the harassment was made possible by abuse of supervisory power. *Faragher,* 524 U.S. at 802–04; *Ellerth,* 524 U.S. 742, 759–60 (1998).  In doing so, the Court created a defense (now aptly referred to as the "*Ellerth/Faragher* defense") to such claims which is available if the harassing behavior did not result in a "tangible employment action" and the employer can demonstrate that two elements are present: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually [or other] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011) (internal quotations omitted).

A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Ellerth*, 524 U.S. at 761. In most instances, an action meeting the standard "inflicts direct economic harm."  *Id*. at 762.  In contrast, a written reprimand, even when accompanied by a probationary period, is not a tangible employment action when it is not accompanied by a suspension, pay reduction, or other loss of benefits.  *See Conatzer v. Med. Prof'l Bldg. Servs. Corp*., 95 F. App'x 276, 280 (10th Cir. 2004).

Moreover, the tangible employment action must be taken by the harassing supervisor, and the plaintiff must establish "a strong causal nexus between the supervisor's harassment and the tangible employment action." *Helm*, 656 F.3d at 1287.

Hawkins asserts that the written warnings she received and the denial of her transfer request were tangible employment actions. The Court disagrees. The written warnings issued to Hawkins did not result in any tangible change in her employment status. She did not suffer a loss or reduction in employment benefits or pay. In addition, the decision to deny Hawkins's transfer was made by Smith, not Wehmeyer. Moreover, as previously noted, the record does not demonstrate that there were any open positions to which Hawkins could transfer. As such, the *Ellerth*/*Faragher* defense is available to the defendants if the remaining elements are met.

The first element of the defense, that the defendants exercised reasonable care to promptly prevent and correct harassing behavior, has two subcomponents: that the employer both try to prevent harassing behavior and that the employer correct harassment that does occur. *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 653 (10th Cir. 2013) *cert. denied*, 134 S. Ct. 2664, 189 L. Ed. 2d 210 (U.S. 2014). The first of these elements can be demonstrated by the adoption of an adequate anti-harassment policy. *Id.* To prove the second, the employer must "show that it acted reasonably promptly on [an employee's] complaint when it was given proper notice of her allegations as required under its complaint procedures." *Id.* (quoting *Helm*, 656 F.3d at 1290).

It is undisputed that the Court Clerk's Office maintains an employee handbook which contains an anti-harassment policy and reporting procedure. The policy prohibits any type of discrimination based upon disability and mandates that any employee that believes she has been harassed should make a written or oral report to a member of management. Hawkins

acknowledged receipt of this handbook and having read the policy and reporting procedure. The Court finds that the first subcomponent of the *Ellerth*/*Faragher* defense is satisfied by the Court Clerk's Office's anti-harassment policy and reporting procedure.

As to the second subcomponent, the first report by Hawkins regarding Wehmeyer's treatment occurred on March 4, 2010, when Smith and Goodson were notified of Wehmeyer's comments regarding Hawkins's son. In response to this complaint, Smith testified that she had a "strong talk" with Wehmeyer and brought the group together for a meeting. (Doc. 81-17 at 139-40). During the meeting, Wehmeyer apologized to Hawkins and Doris, each of whom accepted the apology, and it appeared to Smith that Hawkins and Doris were pleased with the outcome. Smith heard nothing further relevant to Hawkins's claims until over three months later, on June 9, 2010, when there was an email exchange between Smith and Hawkins. Hawkins informed Smith that Wehmeyer had "gotten a lot worse" since the March meeting, but also stated that "[t]hings appear to be better today and, hopefully, it will continue that way." (Doc. 89-13 at 2). Hawkins followed up later that day with an email stating that "[w]e're really hoping today will be the beginning of things getting back to normal so we can continue doing the work we both love." (*Id.* at 1). Based upon these interactions, the Court finds that the Court Clerk's Office acted reasonably in attempting to correct the alleged harassing behavior. To that end, Smith held a meeting four days after Hawkins's complaint and took corrective action with Wehmeyer prior to that meeting. While Hawkins later reported that Wehmeyer's harassment continued, her final contact with Smith left the impression that the situation was "getting back to normal." (Doc. 89-13 at 1). The record does not reflect any attempt by Hawkins to make a further complaint regarding Wehmeyer's behavior. As such, Smith's actions were sufficient as corrective

measures in the absence of any further complaints. *See Debord*, 737 F.3d at 654 ("corrective action does not always require discipline").

An employer may also satisfy the second element of the *Ellerth*/*Faragher* defense "by showing that the victimized employee unreasonably delayed in reporting" incidents of harassing behavior. *Helm,* 656 F.3d at 1291. Here, Hawkins alleges that Wehmeyer began harassing her within two weeks of her return following her stroke (July 2009), but made no report of the harassment until the March 2010 incident. This is a delay of nearly eight months. Hawkins again delayed any negative mention of Wehmeyer's conduct to Smith for another three months after her initial complaint. These periods of delay go well beyond the length of delay found permissible by our circuit's authorities. *See Pinkerton v. Colorado Dep't of Transp*., 563 F.3d 1052, 1063 (10th Cir. 2009) (applying *Ellerth*/*Faragher* defense where plaintiff delayed reporting of harassing behavior for "approximately two or two and a half months"); *see also Thornton v. Fed. Express Corp*., 530 F.3d 451, 457 (6th Cir. 2008) (two month delay). Hawkins offers no justification for this delay and a "generalized fear of retaliation simply is not sufficient", assuming Hawkins would suggest as much. *Pinkerton*, 563 F.3d at 1063. The Court therefore finds, in the alternative, that Hawkins unreasonably delayed in reporting Wehmeyer's purported misconduct.

Having met their burden in demonstrating the applicability of the *Ellerth*/*Faragher* defense, the defendants are entitled to summary judgment with respect to Hawkins's hostile work environment claim.

**III.    Retaliation Claim under the ADA and Rehabilitation Act**

Hawkins claims that she was unlawfully retaliated against for engaging in protected activity in violation of the ADA and the Rehabilitation Act.[9]  More precisely, Hawkins argues that she engaged in protected activity by seeking a transfer or assistance with her check delivery duties and by complaining about Wehmeyer's alleged harassment.  She further maintains that, following this alleged protected activity, adverse employment actions were taken against her which consisted of discipline, the denial of her transfer, and escalated harassment.

"To establish a prima facie case of retaliation, a plaintiff must show: (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009) (internal quotations omitted).  If the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.* (citing *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 752 (10th Cir. 1999)).  If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the defendant's justification is pretextual.  *Id.*

The defendants argue that Hawkins did not engage in protected activity by complaining of Wehmeyer's conduct or seeking an accommodation.  The Court has already found that Hawkins has at least raised a dispute of fact as to whether she sought an accommodation.  The Court has likewise determined that Hawkins did attribute Wehmeyer's alleged harassment to her

---

[9]  As with her accommodation claim, the standards applicable to Hawkins's retaliation claim are the same under the ADA and the Rehabilitation Act.  *See Jarvis v. Potter*, 500 F.3d 1113, 1121, 1125 (10th Cir. 2007) (concluding that the standards for discrimination and retaliation claims under the Rehabilitation Act are the same as those for discrimination and retaliation claims under the ADA).

disability.  As such, the Court will assume for purposes of this analysis that Hawkins engaged in protected activity.  *See Otero v. New Mexico Corr. Dep't*, 640 F. Supp. 2d 1346, 1356 (D.N.M. 2009) ("a request for accommodation in and of itself can be a protected activity under the ADA."); *White v. Midwest Office Tech., Inc*., 5 F. Supp. 2d 936, 951 (D. Kan. 1998) (informal complaints of harassment qualify as protected activity).

The defendants next assert that no adverse employment action was taken against Hawkins and therefore her retaliation claim fails as a matter of law.  The Tenth Circuit has liberally defined the phrase adverse employment action and takes "a case-by-case approach, examining the unique factors relevant to the situation at hand."  *E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1040 (10th Cir. 2011) (quoting *Hillig v. Rumsfeld,* 381 F.3d 1028, 1031 (10th Cir. 2004)). A materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Hennagir*, 587 F.3d at 1266 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)).  The standard is an objective one. *Semsroth v. City of Wichita*, 555 F.3d 1182, 1185 (10th Cir. 2009).  Generally speaking, to constitute an adverse employment action, the act must "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' will rise to the level of an adverse employment action."  *C.R. England, Inc*., 644 F.3d at 1040.  This list is not exhaustive, but a plaintiff must show more than "mere inconvenience or an alteration of job responsibilities."  *Id*.

Hawkins cites three alleged retaliatory actions which she maintains constitute adverse employment actions: increased discipline from Wehmeyer, the denial of her request for a transfer by Smith, and escalated harassment from Wehmeyer.  Hawkins's allegation that Wehmeyer

"escalated her harassment and scrutiny" is simply too vague and generalized to constitute an adverse employment action. Hawkins fails to specifically identify any action taken by Wehmeyer after the March 4 meeting other than her verbal warnings for alleged carelessness and a written warning. Without further detail as to the alleged "escalated" harassment, the Court cannot say it amounts to an adverse employment action. The verbal and written warnings Hawkins received likewise do not amount to an adverse employment action. Based upon the facts presented, the warnings at issue did not alter the conditions of Hawkins's employment and would not have dissuaded a reasonable person from reporting the alleged harassment. Finally, Hawkins's assertion that the June 2010 denial of her transfer request amounts to retaliation fails because there is no retaliatory causal connection between her complaint of alleged harassment or her request for accommodation and the denial of the transfer. The record demonstrates that her request for transfer was denied because there were no vacant positions to which she could transfer.[10] Even assuming a causal connection could be shown, Hawkins has not put forth any evidence to suggest that Smith's statement that there were no available positions was pretextual. In light of the foregoing, the Court finds that defendants are entitled to summary judgment with respect to Hawkins's retaliation claim.

## IV. Oklahoma Anti-Discrimination Statute

Hawkins acknowledges that the success of her state law discrimination claim depends on the viability of her federal claims. (Doc. 89 at 20 ("In Oklahoma, a plaintiff's state law discrimination claims succeed or fail with her corresponding federal discrimination claims.")).

---

[10] Hawkins takes issue with statements made in Smith's June 9 email which were critical of her typing speed, quoted by Smith as 54 words per minute, as it related to a possible data entry position. Hawkins testified that she could type over 70 words per minute and disputed the validity of Smith's information. This dispute is not material given Smith's statements that no positions were available, be they in data entry or not.

Indeed, "[t]he Tenth Circuit has held that a plaintiff's OADA claim fails if her federal discrimination claims fail." *Bennett v. Windstream Commc'ns, Inc.*, ___ F. Supp. 2d ___, 2014 WL 2938346, at *13 (N.D. Okla. June 27, 2014).  Having found that the defendants are entitled to summary judgment with respect to her federal claims, Hawkins's state law discrimination claim is likewise subject to summary judgment.

**IT IS THEREFORE ORDERED** that defendant Smith's Motion for Summary Judgment against Plaintiff, Dorotha Louise Hawkins, and Brief in Support (Doc. 81) is **granted**. Defendant BOCC's Corrected Motion for Summary Judgment and Brief in Support (Doc. 86) is also **granted** in so far as it incorporates by reference defendant Smith's motion.  Summary Judgment is therefore **granted** to the defendants with respect to all of plaintiff's claims.

A separate judgment will be entered herewith.

**IT IS FURTHER ORDERED** that the following pending motions (Docs. 95, 96, 97, 98, 99, 100, 101 and 128) are hereby rendered **moot**.

**SO ORDERED** this 29th day of August, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE